*Attachment A - Amended Complaint*

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2018 OCT 22 PM 4: 28

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

# UNITED STATES DISTRICT COURT

for the

District of Colorado

_____ Division

| | | |
|---|---|---|
| Amy L. Westby | ) | Case No.   1:18-cv-01933-STV-CMA |
| | ) | |
| | ) | *(to be filled in by the Clerk's Office)* |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | Jury Trial: *(check one)*  ☑Yes  ☐No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| | ) | |
| BKD CPAs & Advisors, LLP | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued.  If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of names.)* | | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.   The Parties to This Complaint

**A.   The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Amy L. Westby |
| Street Address | P.O. Box 22661 |
| City and County | Denver; Denver County |
| State and Zip Code | Colorado, 80222 |
| Telephone Number | (720) 563-9839 |
| E-mail Address | AmyLWestby@gmail.com |

**B.   The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | BKD CPAs & Advisors, LLP |
| Job or Title *(if known)* | National Accounting Firm |
| Street Address | 1801 California Street, Suite 2900 |
| City and County | Denver; Denver County |
| State and Zip Code | Colorado, 80202-2606 |
| Telephone Number | (303) 861-4545 |
| E-mail Address *(if known)* | LSOLLIE@BKD.COM |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**C.     Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | BKD CPAs & Advisors, LLP |
| Street Address | 1801 California Street, Suite 2900 |
| City and County | Denver; Denver County |
| State and Zip Code | Colorado, 80202-2606 |
| Telephone Number | (303) 861-4545 |

**II.     Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑     Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐     Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐     Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐     Other federal law *(specify the federal law)*:

☑     Relevant state law *(specify, if known)*:

Colorado Anti-Discrimination Act (CADA)

☐     Relevant city or county law *(specify, if known)*:

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- [✔] Failure to hire me.
- [✔] Termination of my employment.
- [ ] Failure to promote me.
- [ ] Failure to accommodate my disability.
- [ ] Unequal terms and conditions of my employment.
- [✔] Retaliation.
- [ ] Other acts *(specify)*: _____

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.   It is my best recollection that the alleged discriminatory acts occurred on date(s)

Between 08/09/2017 and 09/06/2017

C.   I believe that defendant(s) *(check one)*:

- [✔] is/are still committing these acts against me.
- [ ] is/are not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- [✔] race — I am half-Asian, half-White.
- [ ] color _____
- [ ] gender/sex _____
- [ ] religion _____
- [ ] national origin _____
- [ ] age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*
- [ ] disability or perceived disability *(specify disability)*

_____

E.   The facts of my case are as follows.  Attach additional pages if needed.

(See Attachment A - AMENDED Complaint - Statement of Claims and Claims for Relief)

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

10/05/2017

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☑ issued a Notice of Right to Sue letter, which I received on *(date)* 05/01/2018

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.

☐ less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

(See Attachment A - AMENDED Complaint)

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          10/22/2018

Signature of Plaintiff

Printed Name of Plaintiff      Amy L. Westby

### B.     For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

## Exhibit A: AMENDED COMPLAINT - Statement of Claims and Claims

## for Relief

Amy L. Westby, Plaintiff and Pro Se Litigant

P.O. Box 22661

Denver, CO 80222

*Cellphone*:   (720) 563-9839

*Email*:       AmyLWestby@gmail.com

### UNITED STATES DISTRICT COURT

### DISTRICT OF COLORADO

| | |
|---|---|
| AMY L. WESTBY<br><br>    Plaintiff,<br><br><br>    v.<br><br><br>BKD CPAS & ADVISORS, LLP,<br><br>    Defendant. | DOCKET NO.: 1:18-cv-01933-STV-CMA<br><br>**CIVIL ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF:**<br><br>   (1) TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;<br>   (2) COLORADO ANTI-DISCRIMINATION ACT (CADA)<br><br><br>[JURY TRIAL DEMANDED] |

Plaintiff Amy L. Westby, P.O. Box 22661, Denver, CO, 80222, alleges the following:

## I.   NATURE OF THE ACTION

1.   This is an action for relief from retaliatory employment dscrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII"), and the Colorado Anti-Discrimination Act ("CADA").

2.   Plaintiff Amy L. Westby ("Plaintiff") alleges that Defendant BKD CPAs & Advisors, LLP ("Defendant BKD") and its agents unlawfully harassed her, failed to hire her, unlawfully terminated her employment, and maliciously retaliated against her because of her protected activities. Her protected activities include, but are not limited to, filing an informal discrimination complaint with the company, participating in the investigation and resolution process, complaining about harassment in the investigative and resolution process, and indicating that she would report their wrongful actions to the Equal Employment Opportunity Commission ("EEOC"). The Plaintiff alleges that Defendant BKD acted unlawfully by retaliating in violation of *Title VII*, in violation of *CADA).*

3.   The Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs (if applicable) as remedies for Defendants' violations of her rights, for an amount greater than $75,000, which is to be further determined and proven upon trial.

## II.   THE PARTIES

4.   Plaintiff Amy L. Westby is a half-Asian (South Korean) and half-Caucasian female. She accepted a job offer from Defendant BKD, on November 1, 2016, for a full-

time Audit Associate position with a starting salary of $53,500, including a bonus for passing the CPA exam of up to $5,000, and benefits. Plaintiff Westby was to start on September 20, 2017, about four months after she graduated with her Master of Science in Accounting degree; however, her job offer was unlawfully revoked on September 6, 2017, two weeks before her start date, by Mike Wolfe and Defendant BKD.

5.      Additionally, Plaintiff Westby has an exceptional educational background in accounting and was well qualified for this position. The Plaintiff has three business degrees. She has an Associate of Arts in Business Administration degree from the Community College of Denver, a Bachelor of Science in Accounting degree from the prestigious School of Accountancy at the University of Denver's Daniel's College of Business, and a Master of Science in Accounting degree from the University of Colorado Denver's Business School, where she graduated at the top of her class with a 3.95 GPA. She also is a member of several honor societies, such as Phi Theta Kappa, Beta Gamma Sigma, and the Golden Key Society, and was an active member of the accounting organization, Beta Alpha Psi. In addition, Plaintiff Westby had passed two of the four CPA exams before she graduated with her master's degree and before her start date at BKD.

6.      Upon information and belief, Defendant BKD is a national, public accounting firm that maintains thirty-eight office locations in seventeen states, employing approximately 2,650 individuals. Defendant BKD operates an office in Denver, Colorado, and is headquartered in Springfield, Missouri. All or most of the events alleged herein occurred while Plaintiff Westby was contracted to work for Defendant BKD in the Denver office. Rebecca Curry and Mike Wolfe from the Missouri Headquarters office were also

involved and communicated with the Plaintiff who was located in Denver, Colorado.

7. At all times relevant herein, Defendant BKD had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

8. Defendant BKD was also an "employer" within the meaning of CADA.

9. Upon information and belief, the agents of the company who were involved in this situation, Raena Conklin, Laura Sollie, Rebecca Curry, and Mike Wolfe, are/were employees of Defendant BKD. Raena Conklin and Laura Sollie are/were employed in the Denver office, while Rebecca Curry and Mike Wolfe are/were also employed by Defendant BKD in the Springfield, Missouri office.

10. Defendant BKD is liable for the acts of its agents and employees as set forth below.

11. The Plaintiff is informed and believes and thereon alleges that at all times relevant herein, the Defendant, BKD, and its agents were responsible in some manner for the occurrences and injuries alleged in this complaint.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiff Westby's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. Section 1981(a).

13. This Court has supplemental jurisdiction over the related state law claims under CADA and tort claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with their

federal law claims, and the parties are identical. Resolving the Plaintiff's federal, ~~and~~ state, claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

14.     Venue is proper in, and Defendants are subject to the personal jurisdiction of this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

15.     Furthermore, although Wolfe and Curry reside in another state, Missouri, the Colorado Courts have personal jurisdiction concerning these matters over these two, because the defendants have established minimum contacts in Colorado and the exercise of this personal jurisdiction will not lessen the notion of fairplay or substantial justice.

16.     The due process analysis is comprised of two steps. First, the court must consider whether the defendant has such minimum contacts with the forum state "that he should reasonably anticipate being haled into court there."[1] If the requisite minimum contacts are found, the Court will proceed to the second step in the due process analysis—ensuring that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"[2] "Minimum contacts" can be established in one of two ways, either generally or specifically for lawsuits based on the forum-related activities:

     General jurisdiction is based on an out-of-state defendant's

---

[1] Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1159–60 (10th Cir. 2010) (citing OMI Holdings, Inc. v. Royal Ins. Co. of Can., 149 F.3d 1086, 1091 (10th Cir. 1998)).

[2] See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

"continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a quid pro quo: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.[3]

17.    Wolfe and Curry oversee employees nationally in their roles at the headquarters office for Defendant BKD; they regularly conduct business in differing states, such as Colorado, and make decisions that affect employees in states other than Missouri, because they are high-ranking employees. This likely indicates that they have established general and specific jurisdiction for this case involving Defendant BKD.

18.    In addition, Wolfe and Curry were involved in this legal matter, because they communicated with the Plaintiff across state lines, from their Missouri headquarters office, to Denver, Colorado. They communicated with employees of the company located in the Colorado office, as well, throughout their investigative and resolution process in Plaintiff Westby's discrimination matter, such as when Sollie reached out to Curry in Missouri for help with the discrimination complaint, and when Curry engaged, for approximately 10 days, in communications across state lines with Plaintiff Westby.

19.    Also, Wolfe communicated across state lines and established personal jurisdiction in Colorado's District Court, when he emailed the Plaintiff, who lived and continues to live in Colorado, his letter to withdraw the Plaintiff's job offer. Individual Wolfe

---

[3] Dudnikov, 514 F.3d at 1078 (citations omitted).

and Curry, clearly, maintain minimum contacts in this forum state of Colorado, and have engaged in communications that they and the company benefited from, by revoking the Plaintiff's job offer and replacing her or forgoing the contracted salary amount, and the Plaintiff believes this can also be proved more upon discovery.

20.     Therefore, by definition of their job titles as oversee-ers of the national, public accounting firm, and by proof of their involvement in this legal matter across state lines, it is clear that Wolfe and Curry maintain a constant contact with employees located in the state of Colorado and have established a general and a specific jurisdiction in Colorado, or minimum contacts, or personal jurisdiction in relation to bringing this suit against Defendant BKD.

21.     Wolfe and Curry have established personal jurisdiction in the state of Colorado, and the Plaintiff moves, respectfully, that the District Court of Colorado determines this as so, that they have personal jurisdiction over the case against Defendant BKD that involves their actions, as the first step to prove the Courts have personal jurisdiction is met,[4] having minimum contacts, and the second step is met as well, as explained below.

22.     In addition, regarding the second step in the analysis of personal jurisdiction, Plaintiff Westby asserts that subjecting Defendant BKD to the personal jurisdiction of this court district, based on the actions of their employees located in another state, will *not*

---

[4] Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1159–60 (10th Cir. 2010) (citing OMI Holdings, Inc. v. Royal Ins. Co. of Can., 149 F.3d 1086, 1091 (10th Cir. 1998)).

lessen the notions of fairplay or substantial justice[5]. Employees of BKD travel frequently. For example, all new employees are flown to the St. Louis, Missouri location for training, and employees from the headquarters office, such as Wolfe, trains new employees. Because employees of Defendant BKD travel frequently for work, traveling for work-related issues does not lessen the notions of fairplay or substantial justice. Therefore, the Courts should deem that it has personal jurisdiction over Defendant BKD and the actions of the agents involved from Missouri, because they have established minimum contacts in the state of Colorado, and the exercise of this jurisdiction will not limit the notion of fairplay and substantial justice.

23.     Overall, Wolfe and Curry should have reasonably known that their actions across state lines in dealing with these employment matters could have resulted in them and Defendant BKD having to litigate in the state of Colorado. Because Plaintiff Westby resided in Denver, Colorado since 2008 and has continued to reside in Denver, Colorado for nearly a full eleven years now, and the majority of the actions occurred in Denver, Colorado, or via communications from Springfield, Missouri to Denver, Colorado, the Defendant BKD is subjected to this court district's jurisdiction in regards to Wolfe and Curry's actions across state lines as pursuant to 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.     Plaintiff Westby timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and with the Colorado

---

[5] See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

Civil Rights Commission (CCRD). The Plaintiff filed the charge on October 5, 2017, about 60 days after the initial discriminatory issue occurred on or around August 10, 2017. The EEOC charge was dually filed with the CCRD within the 300-day deadline.

25.     The Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit. The Plaintiff filed this lawsuit in Federal Court on July 30, 2018, exactly 90 days after receiving the Right-to-Sue letter from the EEOC, which was mailed on May 1, 2018 by the EEOC.

26.     Plaintiff Westby did not receive a Notice of a Right to Sue from the Colorado Civil Rights Commission, but received one from the EEOC on or around May 1, 2018. Because the charge was dually investigated by the EEOC and the Colorado Civil Rights Commission, and Plaintiff Westby received a Right-to-Sue letter from the EEOC, the Plaintiff has exhausted her administrative remedies in bringing suit against Defendant BKD for CADA violations, as well.

## V.   FACTUAL ALLEGATIONS

27.     These are the facts surrounding each claim in this case. The facts listed here include, most of the occurrences, but may not include, every detail or fact.

28.     At all times material to this action, Plaintiff Westby was contracted for employment by Defendant BKD as an Audit Associate in BKD's Denver, Colorado office. She accepted a job offer from Defendant BKD on November 1, 2017 with a first-year salary of $53,500, plus benefits. She agreed to start on September 20, 2017, four months after she graduated with her Master of Science in Accounting degree. Plaintiff Westby graduated in May of 2017 and planned on using this time between her

graduation date and her start date to study and pass the Certified Public Accounting

(CPA) exams, so she could obtain a bonus of up to $5,000. In August of 2017, Plaintiff

Westby sent an informal complaint about a discriminatory employment issue to the

company's Human Resources Managers, Sollie and Christine Felke, in Denver and

Colorado Springs, Colorado, after discovering that she had been assigned to work with

someone, a buddy, as a part of her training for her first six months, who had maintained

a public post of an image she drew, which depicted an Asian woman in a stereotypical

way, as well as a phrase that is offensive towards Asians. The Plaintiff was harassed

during the four-week internal investigative and resolution process, and, ultimately, fired

two weeks before her start date. Four weeks after the Plaintiff filed the complaint, on

September 6, 2017, the Plaintiff's job offer was revoked by Defendant Mike Wolfe. He

revoked her offer, he said, because of her communications, mainly with Curry,

regarding the discriminatory issue/s, even though Plaintiff Westby communicated in a

professional manner and was engaging in federally protected activity. The Defendants

retaliated in a malicious and pervasive way, causing an extensive amount of damage to

the Plaintiff.

29.   Between November 1, 2016 and August of 2017, or for about ten months,

the Plaintiff communicated mainly with the Human Resources (HR) Manager, Christine

Felke, in Defendant BKD's Colorado Springs office without any issues.

30.   On July 27, 2017, by phone and by email, Christine Felke informed

Plaintiff Westby that the HR Manager, Defendant Laura Sollie, from the Denver office

would be her main point of contact and that the Plaintiff needed to complete onboarding

duties before her start date. Felke also informed Plaintiff that she would be assigned to

work with a "buddy" as part of her training for her first six months of employment during

the phone conversation. The Plaintiff, then, began communicating with Defendant Laura

Sollie and completing her onboarding tasks; however, Sollie did not tend to respond to

the Plaintiff.

31.     On August 9, 2017, Defendant Raena Conklin contacted Plaintiff Westby

via email, saying she was assigned as her buddy for training. Conklin did not introduce

herself. She stated, "Hi Amy, I hope this finds you well! I have been assigned as your

buddy, and wanted to check in to see if you had any questions, or if you wanted to meet

in person at some point before your start date. If you would prefer, you can contact me

on my cell, 970-529-3083. Looking forward to hearing from you."

32.     On August 9, 2017, the Plaintiff responded to Conklin's introductory email.

The Plaintiff was happy to hear from her buddy, because she was excited about working

for the company. The Plaintiff though did not recall meeting Conklin at the recruiting

event in October of 2017 and thought that Conklin may have been indicating that they

might have met before, due to the casualness of her email. Also, the Plaintiff had been

told by Christine Felke on July 27, 2017 that the Plaintiff and the buddy would be going

out for lunch before her start date. Conklin's email suggested that she would meet with

the Plaintiff if the Plaintiff wanted to meet. Plaintiff Westby replied saying that she would

like to meet for lunch before her start date.

33.     Conklin had not responded to Plaintiff's email as of August 10, 2017, the

next day. The Plaintiff observed Conklin's Facebook on this day and discovered that

Plaintiff Conklin maintained a public post that is/was discriminatory and offensive

towards Asians. Conklin also publicly indicated on her Facebook that she was an

employee of Defendant BKD and maintained fellow BKD employees as friends on her Facebook. Conklin did not indicate that her views or posts were of her own opinion and not representative of the company's beliefs or values.

34.     The discriminatory, public Facebook post was of an image that she had drawn of her Asian, female friend, Mary Dumm. The image was discriminatory and offensive to people of Asian descent, because it accentuated the stereotypical features of Asian women, and it included a written phrase that is known to be offensive to Asians. It was a stick figure of an Asian woman with slanted eyes, making the "V" sign with both hands. She included text that she had written on the image, which said, "I <3 you long time…" This statement is offensive, because of the belief that Asians do not speak proper English; also, because it has negative, sexual connotations. The Plaintiff had reason to believe that the issue of Conklin's discriminatory Facebook posting and being assigned to work with Conklin was a discriminatory issue that could develop into a more severe discriminatory issue if the issue were not addressed for several reasons. For example, the discriminatory image was publicly posted and stereotyped Asian woman; Conklin identified herself as a BKD employee on her Facebook; the Plaintiff had been assigned to work with this person as a condition of her training; and the Plaintiff is a half-Asian female.   The image and coinciding phrase were both offensive to Asians and the Plaintiff is a half-Asian female who was assigned to work with Conklin by an agent of the company, Defendant BKD. The Plaintiff feared that more serious discriminatory issues might develop if she were required to work with Curry for training for six months.

35.     On August 10, 2017, after observing the racially offensive, public

Facebook post, Plaintiff Westby contacted Sollie via email. She expressed her concerns about the post and about being assigned to this person as her buddy for training. She indicated that it was concerning that she had been assigned to work with someone as a part of her training who was maintaining a public post that was offensive and discriminatory towards Asians, considering that the Plaintiff is Half-Asian (South Korean). The Plaintiff also expressed concerns about having to work in a hostile environment if the problem were not addressed or resolved.

36.     On August 10, 2017, Sollie responded by email asking to speak over the phone. The Plaintiff responded that same day and agreed to speak over the phone.

37.     On August 11, 2017, Sollie called the Plaintiff. They spoke for about seventeen minutes. The Plaintiff expressed her concerns about being assigned to work with someone for training who had maintained a public Facebook post that was racist and discriminatory towards Asian people. She also reiterated her concerns about potentially having to work in a hostile work environment if the issue were not addressed. Sollie intimidated the Plaintiff over the phone. She was hostile towards the Plaintiff at times over the phone and told the her that she was being "defensive." She said that Conklin was not intentionally assigned as her buddy. Sollie asked the Plaintiff what she would like the company to do. The Plaintiff asked to have the issue resolved and to be assigned to a new buddy. Sollie said she would try to assign a new buddy and that she would get back to her on August 18, 2017. Sollie contacted the Plaintiff again by phone instead on August 15, 2017.

38.     On August 15, 2017, Sollie called the Plaintiff, and left a voicemail. The Plaintiff returned her call. Sollie told the Plaintiff that a new buddy had been assigned,

because it was, "...the easiest thing to do." The Plaintiff had received an email from her new buddy, Brooke Ribordy, earlier in the day, before the phone call. The Plaintiff said she appreciated the fact that a new buddy had been assigned. The conversation was short and was finished after Sollie addressed the Plaintiff's questions about her onboarding tasks from an August 1, 2017 email. Sollie helped the Plaintiff to complete some of her onboarding tasks, such as filling out her I-9; however, she still had not downloaded the transcripts that Plaintiff Westby had sent and paid to send, even though the Plaintiff kindly reminded her that they needed to be downloaded before the link expired and Sollie had informed her over the phone that she had downloaded them. As of August 27, 2017, three days before one of her electronic transcript downloads would have expired, Sollie still had not downloaded her transcript from the University of Colorado at Denver.

39.    On August 15, 2017, after the phone conversation, Plaintiff Westby sent Sollie a follow-up email. The Plaintiff was concerned that the issue may not have been fully resolved and wondered if the issue had been addressed with Conklin and whomever assigned her as her buddy. Conklin's Facebook post was still publicly displayed. Although the Plaintiff did not expect Defendant BKD to require Conklin to remove the Facebook post, or to make it private, the Plaintiff feared that if the issue were not appropriately addressed, it could lead to her having less opportunities at BKD and a hostile work environment. Also, the Plaintiff worried that the company may try to retaliate, because Sollie was hostile during their first phone conversation. The Plaintiff responded in a professional manner and politely asked Sollie to contact her by email regarding the situation.

40.     Sollie called the Plaintiff again on August 16, 2017 and left a voicemail asking the Plaintiff to call her back. The Plaintiff did not call Sollie back and waited for Sollie to respond by email. She did not. This was the last time Sollie contacted the Plaintiff.

41.     On Monday, August 21, 2017, the Plaintiff sent Sollie a second follow-up email. The Plaintiff worried that Sollie was attempting to retaliate, because she was hostile over the phone during their first conversation on August 15, and the problem appeared to not be fully resolved; also, because about five days had passed since the Plaintiff had sent the follow-up email, and Sollie was not responding by email. The Plaintiff asked Sollie in the email again if she had been assigned to a different team, etc., and was trying to determine if the problem had been fully resolved.

·42.     On August 21, 2017, Plaintiff Westby received an automated email response from Sollie, saying that Sollie would be out of town from August 21, 2017 through August 25, 2017. ·The Plaintiff later learned that Sollie was in Defendant BKD's Missouri office at this time on a work trip.

43.     On August 25, 2017, the Plaintiff received a surprise email from Curry, the Employee Relations and Compliance Manager, who, later, also identified herself as the Equal Employment Opportunity (EEO) Coordinator, from BKD's Headquarters located in Springfield, Missouri. Curry stated that an investigation was conducted, they were happy that the problem was resolved by assigning the Plaintiff to a new buddy, and that they considered the matter to be closed. She did not clearly respond to the Plaintiff's questions from her follow-up email to Sollie, which had been forward to Curry; these questions included whether the Plaintiff had been·switched to a different audit team, or if

the Plaintiff would still be required to work closely with Conklin, and if the issue had been appropriately addressed. Instead, Curry made a general statement, saying that there would be "…no changes to [the Plaintiff's] work assignments or the opportunities [she would] be provided in [her] new role." In response to the Plaintiff's request to view Defendant BKD's discrimination policy, Curry instructed the Plaintiff to view the company's "Anti-Harassment Policy," which she attached to the email.

44.    On August 25, 2017, the Plaintiff responded with a short email saying that she was happy to have been assigned to a new buddy, and that she would contact Curry if she had any further questions. The Plaintiff was concerned though, because the issue had been escalated without her knowledge to Defendant BKD's Headquarters office, and Sollie had never responded to her follow-up email. Curry had also responded unexpectedly and was vague in her response and explanation. Curry had not made any other decisions regarding the matter, other than closing the matter, and, so, this meant that no further action was taken regarding the situation, other than contacting the Plaintiff to inform the Plaintiff that they had conducted a high-level investigation with no differing circumstances and had closed the matter.

45.    Later that day, on August 25, 2017, Plaintiff Westby sent Curry another email, asking for more clarity in her response. Curry did not clearly respond to the majority of questions that the Plaintiff had asked Sollie in her follow-up emails from August 15, 2017, and from August 21, 2017, which had been forwarded to Curry. She asked Curry if it was okay for employees to maintain public posts on their Facebooks that were discriminatory or racist. She also asked Curry to clarify whether they had determined that Conklin's actions were not discriminatory. The Plaintiff indicated that

the Facebook post was still publicly displayed. She also asked again if she had been assigned to a different audit team. The Plaintiff continued to communicate in a professional manner.

46.     On August 28, 2017, Curry responded by email, telling the Plaintiff to refer to the company's policy to determine whether the issue was a discriminatory issue. She, then, copied and pasted a part of her first email, saying again that they conducted an investigation and closed the investigation. She said she believed she "…answered the team/assignment question in [her] first email as well." She, however, provided a vague response in her first email from August 25, 2017. Lastly, she reiterated the fact that the Plaintiff had been assigned a new buddy and that there were "…no changes to [the Plaintiff's] work assignments or the opportunities [she would] be provided in [her] new role." This response though, did not clearly answer the questions the Plaintiff had about her team assignment and the company's resolution. The Plaintiff later learned in Wolfe's job withdrawal letter, that the Plaintiff would still be working closely with Conklin, because they remained on the same audit team. Curry never clearly articulated this though and seemed to be exacerbating the issue in her attempt and Defendant BKD's ongoing attempts to retaliate against Plaintiff Westby for sending the informal discrimination complaint.

47.     On August 28, 2017, the Plaintiff responded to Curry's email. The Plaintiff asked if there was anyone else she could speak to about the situation and was implying that she would like to speak to the company's EEO Coordinator. The Plaintiff had found an outdated discrimination policy for the company online, which listed Nicole Painter as the EEO Coordinator. The Plaintiff wondered why the EEO Coordinator did not initially

respond, and feared, based on Curry's communications and the Defendant's actions, that they may not have been handling the situation appropriately, and were attempting to retaliate against her. In addition, the Plaintiff feared that Curry was implying that the Plaintiff had violated the company's policy. The Plaintiff also expressed concerns about the Curry implying that the issue may not be discriminatory under BKD's policy.

48.     On August 29, 2017, Curry responded to the Plaintiff's email in a manner that made the Plaintiff fear for her job. Curry made threatening statements regarding Plaintiff Westby's employment status and job offer. Curry started her email by stating, "It is unfortunate you interpreted my communication with you to indicate your violation of BKD policy. Let me reassure you that is not correct." In this statement, which was made about seven days before Plaintiff Westby's job offer was unlawfully revoked, Curry told Plaintiff Westby that the Plaintiff had not violated any of the company's policies. She went on to say that employee investigations are confidential and that they were unable to share any further information about the matter. She copied and pasted a part of her first email again, for a third time, saying an investigation was conducted and the matter was closed; also, that the Plaintiff's work assignments and opportunities had not changed. Lastly, she ended her email by stating, "Our employment offer to you still stands and we look forward to you joining our firm and growing your career. If you conclude you do not wish to join our firm, we ask that you let us know at your earliest convenience. We invest significant resources to help ensure a successful start for all of our new hires, and need to make appropriate arrangements in the event you choose not to join BKD." The Plaintiff became even more concerned, because of Curry's statements about the Plaintiff's employment status, and believed that Curry was

attempting to retaliate by indicating that the Plaintiff's employment offer was at risk, because the Plaintiff continued in her attempt to ensure that the discriminatory issue had been resolved and that she would not have to work in a hostile work environment. The Plaintiff had only indicated that she was worried about the issue escalating. The Plaintiff never stated and never indicated in these communications that she did not want to work for BKD.

49.     On August 30, 2017, the Plaintiff responded to Curry's email. The Plaintiff indicated that she was more concerned about the situation, because of Curry's response. She said she was unsure of why the company's EEO Coordinator had not responded instead, or, initially. The Plaintiff indicated that she thought that the company may have been violating her Title VII rights, and, also, that she wanted to try to resolve the matter in civil, or informal, way. Additionally, the Plaintiff expressed her concerns about Curry's request to have the Plaintiff inform the company if the Plaintiff decided she no longer wanted to work for the company. Plaintiff Westby explained that she thought that it was absurd to assume that she wanted to decline her job offer over this issue of discrimination, especially because she had had the job offer for ten months at that point, she had been out of school for about four months, and she was fully prepared to start working for Defendant BKD in only a couple of weeks. She also stated that she would incur a major loss if she declined her job offer. Plaintiff Westby, also, clearly stated that she would like to work for Defendant BKD. She said though that she was highly concerned, because it seemed as though the company were trying to get her to decline her job offer, or that they were putting her job at risk, because she had filed an informal discrimination complaint. Lastly, in response to Curry's question about whether

she would be showing up to work on her start date, Plaintiff Westby made a statement, and believed she was stating the obvious by indicating that she planned on starting on September 20, 2017 if her job offer continued to stand, as Curry said it did in her prior email. She, also, stated that she would exercise her Title VII rights if the discriminatory and harassment issue/s persisted.

50.     On September 1, 2017, Curry called the Plaintiff for the first time and left a voicemail at 7:40 a.m. This was even after she was aware that the Plaintiff had asked Sollie to communicate about the issue by email instead of by phone. She left a voicemail asking the Plaintiff to call her back to discuss the discrimination issue over the phone. She also responded by email at 7:55 a.m. and urged the Plaintiff to speak with her over the phone. She asked the Plaintiff to either call her, or to provide her with a time that she would be available to speak.

51.     The Plaintiff responded by email on Saturday, September 2, 2017 at 12:45 p.m. and stated that she was not comfortable with speaking over the phone and asked to speak with BKD's EEO Coordinator.

52.     On September 5, 2017, Curry contacted the Plaintiff by phone for a second time, and left a second voicemail, even after the Plaintiff had asked several times to communicate through email about the situation. She also responded by email. She called the Plaintiff again at 2:06 p.m. and left another voicemail. She, then, emailed the Plaintiff at 2:13 p.m. saying that she was following up on her voicemail. She informed the Plaintiff for the first time that she was the EEO Coordinator for BKD and demanded that the Plaintiff speak to her over the phone about the discrimination issue, because she believed that the Plaintiff misunderstood her emails. The Plaintiff though

believed that the Curry was harassing her at this point. Curry scheduled what seemed to be a mandatory Skype meeting for me to attend the next day on September 6, 2017 at 9:00 a.m. Missouri time, or 8:00 a.m. Colorado time. In this meeting, she also wanted the Plaintiff to speak with Julie Cummings, the Chief HR Manager for BKD, also in the Missouri office.

53.     On September 5, 2017 the Plaintiff responded to Curry's call and email by email at 3:14 p.m., or about an hour after she sent her email. The Plaintiff said she was unsure of why she did not inform me sooner that she was the EEO Coordinator. She, again, stated that she was not comfortable speaking over the phone with her about the discrimination issue. The Plaintiff also said that she would like to "seek other options" to resolve the matter, because she was "…highly concerned that this issue would have a major negative effect on my future work opportunities."

54.     On September 5, 2017, Curry responded to the Plaintiff by email about 4 hours later at 6:55 p.m., and, again, told the Plaintiff that she needed to speak to her and Julie Cummings because she said the Plaintiff misunderstood her emails. She said her and Julie would plan on speaking to me on Skype at 9:00 a.m. their time on September 6. The Plaintiff believed she had understood Curry's emails and that Curry were attempting to retaliate by threatening her job offer.

55.     On September 5, 2017, the Plaintiff sent Curry a detailed email outlining all of her concerns about the situation, even though the Plaintiff had planned on not responding, because she feared that Curry and Defendant BKD were trying to retaliate by putting her job offer at risk. She feared though that if she did not respond, the Defendant would also take adverse actions against her, so she responded in an attempt

to prevent them from escalating the situation even more. In the Plaintiff's email, she stated that she was unsure of what they wanted to discuss over the phone, considering that they had repeatedly told her that they believed that issue was appropriately handled and the case was closed. The Plaintiff said that although she thought she should seek other options and should speak to an attorney at that point, she would speak to Rebecca and Julie on Skype, and attempt to explain her thoughts more clearly and in more detail to ensure that they would have a productive Skype conversation. The Plaintiff, then, explained in detail why she thought they were violating her rights under Title VII and why she thought she needed to seek other options to resolve the matter. Plaintiff Westby informed them that she would not be available to speak on September 6, 2017 as Curry had requested, but would be available on September 7 after 1:00 p.m.

56.     On September 6, 2017, at 7:49 a.m., Colorado time, Curry contacted Plaintiff Westby stating that she had cancelled the Skype meeting between her, Julie Cummings, and the Plaintiff that she had scheduled for 8:00 a.m., and said they would be unable to meet on the day that she suggested. She said she would get back to the Plaintiff with a different time to meet, but that was the last time Curry contacted the Plaintiff.

57.     Eight hours later, at 4:00 p.m., on September 6, 2017, exactly two weeks before the Plaintiff's start date, and after about a four-week investigative and resolution process, the Chief Risk Officer, Mike Wolfe, who was also located in the Springfield, Missouri headquarters office, contacted Plaintiff Westby via email, stating that he and Defendant BKD had revoked the Plaintiff's job offer over, mainly, her communications, which were protected communications, with Curry. The Plaintiff believes that this

reasoning was a pretext for discrimination and that this materially adverse employment action was taken as a means to retaliate against the Plaintiff for filing the informal discrimination complaint and for seeking further clarification on the matter.

58.    On October 5, 2017, the Plaintiff filed an official complaint with the EEOC against Defendant BKD for discrimination and retaliation in violation of Title VII of the Civil Rights Act.

59.    On February 5, 2018, the Plaintiff attempted to file an additional retaliation charge in this case against Defendants BKD, et al, with the EEOC; however, the charge was never added. The Plaintiff believed that the Defendant had continued to engage in retaliatory behavior, such as witness intimidation and blacklisting, because the Plaintiff was denied accounting jobs that she had applied for and was qualified for, but was denied, even though these jobs were with much smaller accounting firms. The Plaintiff continues to suffer irreparable harm.

60.    On May 1, 2018, the EEOC sent Plaintiff Westby a Right-to-Sue letter after the Plaintiff did not respond to Defendant BKD's response to the EEOC claim.

61.    On July 30, 2018, the Plaintiff filed a civil action in Federal Court in the U.S. District of Colorado.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Retaliation (Harassment, Failure to Hire, and Termination of Employment) in Violation of

Title VII of the Civil Rights Act of 1964, *as amended*,

42 U.S.C. § 2000e-3 (a).[6]

62.    Plaintiff Westby incorporates by reference as if fully set forth herein the

allegations contained in paragraphs 27 through 61, above, but will also reiterate most of

those facts in more detail here.

### A.    General Legal Authorities and Standards for Title VII Retaliation

63.    Section 704 (a) of Title VII, *as amended*, 42 U.S.C. § 2000e-3 (a), makes it

unlawful for employers to discriminate and retaliate against employees who engage in

protected *opposition* or *participation* activities. This section states that it is unlawful to

"discriminate" against employees, "…because he [or she] has *opposed* any practice

made an unlawful employment practice by this subchapter, or because he [or she] has

made a charge, testified, assisted, or *participated* in any manner in an investigation,

proceeding, or hearing under this subchapter." The Plaintiff will show in this claim that

she has established a *prima facie* case of Title VII retaliation, in violation of this

provision, against Defendant BKD under the "*opposition*" clause, but would like to ask

---

[6]

the Court, respectfully, to also consider the retaliation claim under the "*participation*"
clause, as explained below.

64.    To establish a (*prima facie*) claim of retaliation under Title VII, the Plaintiff
must show that she meets the requirements of the Title VII retaliation elements, which
include that: (1) [she] engaged in activity protected by Title VII; (2) an adverse
employment action occurred; and (3) a causal connection between participation in the
protected activity and the adverse employment action. Id. at 713- 14. (citations omitted).
Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir.), cert. denied, 537 U.S. 1001, 123
S.Ct. 485, 154 L.Ed.2d 396 (2002); see Sowell v. Alumina Ceramics, Inc., 251 F.3d 678,
685 (8th Cir.2001); Buettner, 216 F.3d at 713-714.

65.    In addition to these requirements, the plaintiff must show that a
reasonable person could believe that the alleged incidents would violate Title VII's
standard. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S.Ct. 1508, 149
L.Ed.2d 509 (2001)". Soto v. John Morrell & Co. 285 F.Supp.2d 1146, 1176
(N.D.Iowa,2003). See also, Fortner v. Ameritech Corp. 50 Fed.Appx. 187, 188-189,
2002 WL 31379880,*2 (6th Cir.Mich. 2002)("In order to establish a prima facie case of
retaliation, the plaintiff must prove that: "(1) he engaged in activity protected by Title VII;
(2) the exercise of his civil rights was known to the defendant; (3) thereafter, the
defendant took an employment action adverse to the plaintiff; and (4) there was a
causal connection between the protected activity and the adverse employment action."
Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000).

66.    Once the plaintiff establishes a prima facie case of retaliation, the burden
shifts to the defendant to produce "some legitimate, nondiscriminatory reason" for the

adverse employment action. Texas Dep't of Community Affairs v. Burdine, 450 U.S.
248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

67.     If Defendant BKD is able to proffer a nondiscriminatory reason for the
adverse action, the burden shifts back to Plaintiff Westby to produce credible evidence
that the reason offered by the Defendant is a mere pretext for unlawful retaliation.
Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 804.")

68.     If the Plaintiff is able to show in this claim that she has a *prima facie* case
of retaliation, the Courts should MOVE to have the Defendant BKD respond, according
to the burden-shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792,
802-04 (1973).*[7]

69.     Also, Plaintiff Westby would like to ask the Court, respectfully, to consider
the following legal analysis when determining the *plausibility* of her Title VII retaliation
claim against Defendant BKD, which explains that she does not need to prove matters
without a doubt, or at a great length, in this phase of the legal process.

a.      "According to an August 27, 2015 article posted by Gallo Vitucci Klar, LLP[8], "In

---

[7] *Antonia v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006) (Title VII and 42 U.S.C.
§ 1981 retaliation claims analyzed under *McDonnell Douglas*); *Daniels v. United Parcel Serv.,
Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (ADEA retaliation claim analyzed under *McDonnell
Douglas*); *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL
5728770, at *8 (D. Colo. Sept. 30, 2015) (CADA retaliation claim analyzed under *McDonnell
Douglas*); *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016) (ADA
retaliation claim analyzed under *McDonnell Douglas*).

[8] http://www.gvlaw.com/news/plausibility-pleading-standard-for-title-vii-discrimination-cases-
clarified-and-eeo-directors-own-complaints-of-discrimination-found-to-be-protected-activity

a decision earlier this month, the Second Circuit reinstated disparate treatment and retaliation claims filed by a former New York City, Administration for Children's Services ("ACS") Director of its Equal Employment Opportunity Office and held that a plaintiff at the pleading stage "does not need substantial evidence of discriminatory intent" but rather "gets the presumption of discriminatory intent." Littlejohn v. City of New York, No. 14-1395-CV, 2015 WL 4604250 (2d Cir. Aug. 3, 2015). The District Court granted defendants' 12(b)(6) motion to dismiss in its entirety on the grounds that she failed to adequately plead her discrimination claims."

b.   "In the opinion, the Second Circuit closely examined the pleading standards for Title VII discrimination claims and clarified that, at the pleadings stage, the plaintiff does not have to show an ultimate prima facie case of discrimination and gets the benefit of a temporary presumption such that the pleadings must be viewed in the light of most favorable to plaintiff. "The plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defendant's motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification."

c.   "Significantly, the Circuit Court held that a Title VII plaintiff satisfies the FRCP 8(a)(2) notice pleading standard of "*plausibility*" under the Supreme Court's Iqbal decision simply by alleging the *prima facie* elements of her case."

d.   "In Iqbal, the Supreme Court said that a plaintiff alleging discrimination must plead "enough facts to state a claim to relief that is *plausible* on its face." Ashcroft v. Iqbal, 556 U.S.662, 697 (2009). Looking to the "quartet of cases"

led by McDonnell Douglas v. Green, 411 U.S. 792 (1973) as well as Swierkiewsicz v. Sorema, NA, 534 U.S. 506 (2002) and Ashcroft v. Iqbal, 556 U.S.662 (2009), the Second Circuit held that the Iqbal requirement of "plausibility" applies to Title VII complaints of employment discrimination but does not affect the benefit to plaintiffs of the McDonnell framework for burden-shifting between parties, including the *temporary presumption in plaintiff's favor.*"

e.    "The Circuit Court then considered '…what, in the Title VII context, must be *plausibly* supported by factual allegations when the plaintiff does not have direct evidence of discriminatory intent at the outset.' The court explained, 'absent direct evidence of discrimination, what must be *plausibly* supported by facts alleged in the complaint is that the *plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent.* The facts alleged must give *plausible* support to the reduced requirements that arise under *McDonnell Dougla*s in the initial phase of Title VII litigation. The facts required by Iqbal to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give *plausible* support to a *minimal* inference of discriminatory motivation."

70.    Plaintiff Westby asks, respectfully, that the Court uses this analysis of plausibility to determine whether she meets the *plausibility* standards, based on a "…minimal inference of discriminatory motivation." Although she does believe that she

has stated her claim properly to show the discriminatory motivation, it may be necessary to prove this further in trial, upon discovery.

71.    Next, the Plaintiff would also like to ask the Court, respectfully, to consider her Title VII retaliation claim under the "*opposition*" *and* the "*participation*" clauses, as explained in the following paragraphs.

a.    By sending an informal, internal discrimination complaint via email on August 10, 2018 to the company's Human Resources Managers, Sollie and Christine Felke, and by complaining about harassment, among other issues that developed after she sent her initial complaint, Plaintiff Westby engaged in protected activity, including *opposition, and*, according to the new 2016 EEOC guidance[9], *participation*.

b.    Her protected activity may also be construed as a *participation* activity, because the EEOC and several courts now consider internal discrimination complaints to be a *participation* activity, as well as an *opposition* activity. For example, the EEOC guidance states, in Section II (A)(1) (par.5):

i.    "Although courts often limit the *participation* clause to administrative charges or lawsuits filed to enforce rights under an EEO statute, and instead characterize EEO complaints made internally (e.g., to a company manager or human resources department) as "opposition[10]," the Supreme Court in Crawford v. Metropolitan Government of

---

[9] *EEOC Enforcement Guidance on Retaliation and Related Issues* – Notice Number 915.004 – Aug. 25, 2016 -Sections II (A) (1) & (2)

[10] *See, e.g., Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012) (ruling that the participation clause includes participation in internal investigations only after a charge has been filed)

Nashville & Davidson County explicitly left open the question of whether internal EEO complaints might be considered "participation" as well[11].

ii. The Commission and the Solicitor General have long taken the view that participation and opposition have some overlap, in that raising complaints, serving as a voluntary or involuntary witness, or otherwise *participating in an employer's internal complaint or investigation process*, whether before or after an EEOC or Fair Employment Practices Agency (FEPA) charge has been filed, is covered under the broad protections of the *participation* clause, although it is also covered as "*opposition.*" [12]

iii. The plain terms of the *participation* clause prohibit retaliation against those who "participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e-3(a) (emphasis added). As courts have observed, these statutory terms are broad,

---

[11] 555 U.S. 271, 280 (2009).

[12] *See* Brief of the EEOC as Amicus Curiae in Support of Appellant and in Favor of Reversal, *DeMasters v. Carilion Clinic,*796 F.3d 409 (4th Cir. 2015) (No. 13-2278), https://www.eeoc.gov/eeoc/litigation/briefs/demasters.html; Brief of the EEOC as Amicus Curiae in Support of Appellant and in Favor of Reversal, *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41 (2d Cir. 2012) (No. 09-0197-cv(L)), https://www.eeoc.gov/eeoc/litigation/briefs/townsend1.txt; Brief of the EEOC as Amicus Curiae in Support of Suggestion for Rehearing En Banc, *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346 (11th Cir. 1999) (No. 97-9229); Brief for the United States as Amicus Curiae Supporting Petitioner, *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271 (2009) (No. 06-1595), http://www.justice.gov/osg/brief/crawford-v-metropolitan-govt-nashville-amicus-merits.

unqualified, and *not expressly limited* to investigations conducted by the EEOC[13]…"

72.   Although Plaintiff Westby believes she meets the requirements under the "*opposition*" clause of the Title VII retaliation provision and can show that she "reasonably believed" that they violated Title VII standards, she would, respectfully, like to ask the courts to also consider her Title VII retaliation claim under the "*participation*" clause, as well, based on the EEOC Guidance noted in the above paragraphs. She also believes that by showing that she meets the requirements of the elements under the "*opposition*" clause, that she also meets the requirements under the "*participation*" clause, mainly, because the EEOC Guidance indicates that her informal complaints to her employer, Defendant BKD, were protected communications under both clauses and the requirements under the "*opposition*" clause are the same as the requirements under the "*participation*" clause, but with one more stringent requirement, to demonstrate that the employer/agent acted with discriminatory motive or animus.

73.   The *participation* clause, according to the EEOC Guidance, has broader protections:

a.   "The participation clause applies even if the underlying allegation is not meritorious or was not timely filed[14]." This is not to say that the Plaintiff's

---

[13] *Merritt*, 120 F.3d at 1186 (reasoning that "[t]he word 'testified' is not preceded or followed by any restrictive language that limits its reach" and it is followed by the phrase "in any manner," indicating its intended broad sweep); *United States v. Wildes*, 120 F.3d 468, 470 (4th Cir. 1997) (reasoning that the statutory term "'any' is a term of great breadth").

[14] "It is well settled that the participation clause shields an employee from retaliation regardless of the merit of his EEOC charge." *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978)

allegations were not meritorious or not timely filed but is referenced to emphasize the differences (and similarities) between the participation and opposition clauses.

b.    Also, "The Commission has long taken the position that the participation clause broadly protects EEO participation regardless of whether an individual has a reasonable, good faith belief that the underlying allegations are, or could become, unlawful conduct[15] ...In contrast to the opposition clause, which protects opposition to practices "made . . . unlawful" by the statute, and therefore requires a reasonable good faith belief that conduct potentially violates the law, the participation clause protects participating "in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e-3(a)

## B.    General Summary of Plaintiff's Retaliation Title VII Retaliation Claim

74.    The Plaintiff made informal and formal complaints to Defendant's agents and employees opposing Defendant's unlawful, discriminatory employment issues based on race, harassment and retaliation, and in an attempt to prevent the issue of a

---

(citing *Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1004-1007 (5th Cir. 1969)); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

[15] *See, e.g.*, Brief of the EEOC as Amicus Curiae Supporting the Appellant, *Risley v. Fordham Univ.*, No. 01-7306 (2d Cir. filed Aug. 21, 2001), https://www.eeoc.gov/eeoc/litigation/briefs/risley.txt (arguing that "Title VII prohibits an employer from retaliating against an employee for filing a charge with the EEOC without regard to whether the employee reasonably believed that the actions challenged in the charge violated Title VII")

potentially having to work in a hostile work environment arising.

75.   Because of Plaintiff Westby's complaints, which Responsible Management Officials were aware of, Defendant BKD's agents and employees took materially adverse actions against the Plaintiff, including, but not limited to, intimidating her and harassing her throughout the investigative and resolution process, failing to hire her, and terminating her employment with the company.

76.   The Plaintiff was subjected to harassment by Defendant's agents and employees, including Sollie and Curry, because of her race, half-Asian and half-Caucasian, and her informal complaints about the discriminatory employment issues.

77.   Defendant BKD's adverse actions constituted retaliatory workplace harassment.

78.   Defendant BKD's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

79.   As a direct, legal and proximate result of Defendant BKD's retaliation, Plaintiff Westby has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

80.   The Plaintiff has had a difficult time finding a comparable job in accounting. She, recently, had obtained a job working for minimum wage plus tips, but is currently unemployed, as she has been since her job offer was revoked in September of 2017, and has been unemployed for about over a year now . She was unable to work for the past year, since her job offer was revoked, for several reasons, mainly because she believes she has been blacklisted by the public accounting community in Denver, and she has had to devote a lot of time to this employment discrimination case. Also,

the Defendant's adverse action has made it difficult for Plaintiff Westby to regain employment in a similar field, because the Plaintiff had graduated four months prior and did not have the same resources, such as recruiting networks and events to attend, as she did while in school. The Plaintiff has also been subjected to extreme emotional distress because of the Defendant BKD's actions and her accounting career has been permanently damaged. The Plaintiff will now likely have to change her career path and obtain her PhD to mitigate these damages, or to salvage her accounting education and any potential to develop a career in the field of accounting.

81.    Defendant's agents and employees' unlawful conduct was not welcomed by the Plaintiff.

82.    Defendant BKD's agents' and employees' conduct was undertaken because of the Plaintiff's race, half-Asian, and because of her informal complaints about employment discrimination and retaliation in violation of Title VII.

83.    The conduct was so severe or pervasive that reasonable persons in Plaintiff's positions would find Defendant BKD's agents' actions towards the Plaintiff to be hostile or abusive, and a means of retaliation.

84.    The Plaintiff believed her work environment would become hostile or abusive as a result of Defendant's agents' and employees' conduct and argues that the situation did become a hostile situation and resulted in the Plaintiff's job offer being revoked (an adverse action).

85.    · Plaintiff Westby engaged in protected *opposition* and *participation* under this section of the law when she sent an informal complaint to Defendant BKD's Human Resources Managers, Laura Sollie and Christine Felke, about a discriminatory

employment issue, when she communicated with Curry from the headquarters office in Missouri about the discriminatory issue, and when she participated in Defendant BKD's internal investigative and resolution process.

86.     After sending this informal complaint, the Defendant BKD subjected her to adverse employment actions. The Plaintiff was intimidated and harassed by Sollie and Curry during the investigative and resolution process, and her job offer was revoked two weeks before her start date, which was about four weeks after she sent the initial internal complaint. Defendant BKD failed to hire her, because of her opposition, and their reasoning for her job revocation was a pretext for discrimination. These adverse actions would not have occurred if the Plaintiff had not engaged in protected activity by sending this informal discrimination complaint. Other similarly situated individuals were not subjected to this same type of treatment. Other new hires were not put into a discriminatory situation that had potential to escalate when they were assigned buddies for training and their communications were not as highly scrutinized. In addition, at trial, more situations involving similarly situated individuals may arise.

87.     Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel with information sufficient to raise a probability of race harassment and retaliation in the mind of a reasonable employer.

88.     Defendant BKD did not exercise reasonable care to prevent harassment in the workplace based on the race and to prevent retaliation, and did not exercise reasonable care to promptly correct any harassing behavior or retaliation that did occur.

89.     As a direct, legal and proximate result of the discrimination and the

retaliation, Plaintiff Westby has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount over $75,000 to be proven at trial.

90.   Defendant BKD's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff Westby's right to be free from discrimination based on race and to be free from retaliation in violation of Title VII of the Civil Rights Act of 1964. Plaintiff Westby has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff Westby further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for retaliation violations of Title VII, to be proven at trial.

91.   Plaintiff Westby is entitled to reasonable attorneys' fees and costs of suit, if applicable.

## C.   Showing a *Prima Facie* Title VII Retaliation Case

92.   Plaintiff Westby will now show that she meets each of the four elements needed to establish a *prima facie* case of retaliation under the legal standards noted above in this First Claim (Section A – Legal Authority...) (paragraphs 63 to 73)...

## C1. First Element – Protected Activity

93:   The Plaintiff meets the first element requirement of showing that she engaged in *protected activity*, for several reasons, under the "*opposition*" and "*participation*" clauses of Title VII.

94.   Plaintiff Westby argues that she engaged in *protected activity* when she sent her initial discrimination complaint, when she communicated throughout the four-week

investigative and resolution process, and when she complained about Defendant BKD's agents' intimidating, harassing, and retaliatory behavior. These reasonings are further explained below, but her claim is not limited to these reasons:

95.     Plaintiff Westby read on the EEOC site in the "Harassment" section[16] early on in the internal complaint process, that employees could and should attempt to prevent the violation of Title VII laws before they escalate into hostile work environments or more serious discriminatory issues. It states, "*Employees are encouraged to inform the harasser directly that the conduct is unwelcome and must stop. Employees should also report harassment to management at an early stage to prevent its escalation.*" The Plaintiff argues that she reasonably believed that she was complaining of discrimination upon her initial complain, and throughout the entire internal, investigative and resolution process; also, that she was engaging in *protected activity*, because she was attempting to prevent the discriminatory issue from developing into a more serious one.

96.     In her first internal discrimination complaint sent by email on August 10, 2017, to Sollie, HR in Denver, and Felke, HR in Colorado Springs, the Plaintiff engaged in *protected activity*. The Plaintiff stated that she was concerned, because she had been assigned to work with someone as a condition of her training who had publicly maintained a Facebook post of an image that she drew of her Asian friend, Mary Dumm. The image depicted an Asian woman in a racist and stereotypical manner, as a stick figure, with slanted eyes, making the "V" sign, and with straight black hair parted down the middle and, also, included a stereotypical and racist phrase that is belittling and insulting to Asian people. The phrase, "I <3 (love) you long time," is insulting to Asian people because it suggests that Asian people do not speak proper English and belittles those that have

---

[16] https://www.eeoc.gov/laws/types/harassment.cfm

accents; it also has negative sexual connotations that stereotypes Asian women. The Plaintiff engaged in *protected activity* by complaining about this discriminatory Facebook post, which was publicly displayed on Conklin's Facebook where she indicated she was a BKD employee and, also, maintained friends from work on her Facebook, making it appear to be an extension of the workplace, because the Plaintiff reasonably believed that this was a violation of Title VII and could lead to further violations; therefore, Plaintiff Westby meets the conditions of the first element, because she filed an internal discrimination complaint, which was also *protected activity*.

    a.    A reasonable person might conclude that the Conklin who maintained this discriminatory post were or might be racist, had unconscious bias, or that she might engage in this type of behavior in the workplace. This demonstrates that the Plaintiff reasonably believed she was engaging in protected activity.

    97.    The Plaintiff also engaged in *protected activity* when she complained about being harassed and when she communicated throughout the internal, investigative and resolution process. Between August 10, 2017 and September 6, 2017, Plaintiff Westby continued to assert her Title VII rights as she communicated with the Defendant BKD's agents and as they became more hostile towards her. For example, when Curry continued to communicate in an intimidating manner and continued to call the Plaintiff after the Plaintiff had asked not to be called, harassing the Plaintiff, the Plaintiff continued to assert that she believed that her Title VII rights were being violated and that she was concerned that the issue would have a negative effect on her employment and her opportunities as an employee, because they were harassing her and intimidating her. These statements

indicate that the Plaintiff *reasonably believed* that they were continuing to violate Title VII standards, such as those that disallow harassment in the process, and retaliation, and that she was engaging in *protected activity*.

98.  Also, by engaging in intimidating behavior, the Plaintiff believed that the company's agents were continuing to discriminate against her, implicitly because of her race, in violation of Title VII and her complaint. The Plaintiff believed it had developed into an ongoing discriminatory issue, and that the company would not have retaliated with intimidation and harassment tactics, if the Plaintiff had not complained, or if the Plaintiff were not of the Asian race. The agents of the company, Defendant BKD, were aware that the Plaintiff was complaining not only about the race-based discriminatory issue involving the Facebook post and the assignment to work with Conklin who maintained and continued to maintain the post, but, *also*, about the intimidation and harassment tactics used by the HR personnel. These facts also demonstrate that the Plaintiff reasonably believed that she was engaging in *protected activity* under Title VII and that the company was violating her Title VII rights.

99.  Overall, the Plaintiff meets the first element necessary to establish a retaliation claim under Title VII, because she has shown that she engaged in *protected activities* under the *opposition* and *participation* clauses of Title VII when she: complained about discrimination, about the potential for the discriminatory issue to progress, and about the harassing and intimidating, or retaliatory behavior, of Defendant BKD's agents throughout the four-week investigative and resolution process.

## C2. Second Element – Adverse Action

100.  Plaintiff Westby meets the second element necessary to establish the

retaliation claim under Title VII, because the Plaintiff can prove that the employer took an *adverse action*.

101. The Plaintiff argues that several facts show that the action was *adverse*, which include, but are not limited to: the circumstances that directly led to her firing, such as the harassment by Curry; the fact that her employment was terminated; the causal connection between the adverse action and the protected activity as evidenced by Wolfe's reasoning; the action reasonably deterred her from pursuing a legal claim; the action was malicious; Wolfe's inaccuracies and falsities in his reasoning for her firing indicate a pretext for discrimination; she can establish temporal proximity based on the timing of their adverse actions in relation to her complaint; Wolfe stated plainly that he fired her over her (protected) communications in a two-page letter; Plaintiff Westby communicated in a reasonable manner; and more.

102. This explanation is provided below:

103. Throughout the four-week investigative and resolution process, the Defendant's agents, Sollie and Curry, were hostile towards the Plaintiff and harassed her, as evidenced by their actions, emails, written comments, and harassing phone calls noted in the "Facts" section of this complaint. Curry even made threatening statements about the Plaintiff's employment in emails. This intimidating behavior shows that the Defendant BKD's agents were threatening to take an *adverse action*, because of her protected activities and, implicitly, because of her race.

104. The very fact that Plaintiff Westby's employment was terminated (because of her protected communications) indicates that Defendant BKD took an *adverse action*.

105. Wolfe's reasoning indicates that there is a correlation between his decision

to terminate the Plaintiff's employment and her protected communications, or that there is a causal connection between these factors. This causal connection, *but-for* factor, also shows that his decision was an *adverse action*. He stated that he believed that, based on the Plaintiff's (protected) communications throughout the internal discrimination investigative and resolution process, mainly, with Curry, that the Plaintiff did not have the communication skills necessary to be successful as an auditor at BKD. Wolfe's reasoning proves that, *but-for* the Plaintiff's internal discrimination complaint, the Plaintiff would likely not have had her job offer revoked[17]. This correlation and *but-for* evidence also shows that the Wolfe's action was an *adverse action*, because it would not have occurred if she hadn't complained and communicated her concerns about the discriminatory issue/s.

106.    Additionally, Wolfe's action was *adverse*, because it would reasonably deter a person from pursuing an EEOC claim, because it caused the Plaintiff to no longer be employed. The Plaintiff's employment was negatively affected to an extreme level, because of his *adverse action* and she was deterred from pursuing the case legally.

107.    Also, Wolfe's decision was clearly malicious. Wolfe, being an experienced accountant and familiar with the recruiting process for auditors and those seeking jobs in public accounting, also likely knew that by revoking the Plaintiff's job offer, he would significantly reduce her ability to enter into the field of public accounting and would make it difficult for her to find a comparable job. By revoking her job offer, he ruined her auditing career, and she must now likely enter into a different field of accounting or pursue her PhD. Because the Plaintiff has shown that Wolfe's intent was also clearly malicious, she further shows that Wolfe's decision was an *adverse action* under Title VII.

---

[17]

108.    Furthermore, because Wolfe's reasoning, which is evidenced in his September 6, 2017 job withdrawal letter, refers directly to the discriminatory issue and the Plaintiff's protected communications, Plaintiff Westby can show that this reasoning was a pretext for discrimination and an *adverse action.* She believes that his reasoning, especially, indicates Wolfe's and Defendant BKD's maliciously retaliatory intent and serves as evidence that the revocation of the Plaintiff's job offer was an *adverse action* under Title VII, because it also proves that "*but-for*" her informal discrimination complaint or protected activities, Defendant BKD would not have revoked her job offer. Also, that the decision was likely made in an attempt to justify the discriminatory actions and as a pretext for discrimination, because of the inaccuracies and falsities of his reasonings. For example, Wolfe stated in his job withdrawal letter:

a.      "*The way you have communicated with the company in this process reflects a communication style and personal approach inconsistent with how we work at BKD. Your emails reflect that you jumped to conclusions about others' intentions, and your emails repeatedly mischaracterized and misstated what Rebecca Curry had communicated to you in prior emails. For example, Rebecca assured you that you would work in the same group and do the same kind of work as originally planned, but you claimed in your subsequent emails that we refused to give you that assurance.*" Wolfe lists more reasons as to why he believed the Plaintiff's (protected) communications were inappropriate and scrutinizes all of the Plaintiff's protected activities. The Plaintiff believes that her emails though, among other evidence, prove that her communications were appropriate and reasonable; therefore, the Plaintiff can

show that Wolfe's action was *adverse*, because of the falsity, inaccuracies, and exaggerations of his proffered reason. Also, because he revoked her offer over protected activities.

b.   Wolfe also stated, "*We are not taking this action because of your report about the Facebook post. We are taking this action because your conduct and communications in response to Rebecca Curry have caused us to conclude that you will not be able to perform the duties of an Audit Associate in a manner consistent with our expectations for that position.*"

c.   Plaintiff Westby argues that these statements show the Court that Wolfe revoked her offer over her reasonable, protected communications, and that they also indicate that Defendant BKD took an *adverse action*.

109.   To summarize, in regard to the above statements, it is clear that Wolfe revoked the Plaintiff's job offer over her communications about the discriminatory and retaliatory issues, which the Plaintiff has shown were protected communications Additionally, it is clear, because not all of his assertions are accurate. Plaintiff Westby did not jump to conclusions and did not mischaracterize what Curry said in her emails. For example, he states that Curry told the Plaintiff she would work in the same group as Conklin, but Curry never stated that (this is evidenced in their email communications). That was the first time that they had indicated to the Plaintiff that she would still be required to work closely with Conklin. Because of the inaccurate statements and their refusal to clarify this earlier on, the Plaintiff, also, believed that the discriminatory issue was ongoing and had the potential to escalate further upon her hiring, because it seemed that the issue had not been fully resolved and that they were retaliating. Wolfe's statements clearly show that there is a *causal connection* between Plaintiff Westby's

protected communications and potential race discrimination and Wolfe's, or Defendant BKD's, *adverse employment action* in violation of Title VII, and that Wolfe's decision to revoke Plaintiff Westby's job offer was in fact an *adverse decision*.

110.   In addition, the Plaintiff argues that Defendant BKD's, or Mike Wolfe's, reasoning and decision to revoke her job offer was pretext for discrimination, and, therefore, an *adverse action*, because she did not engage in any inappropriate behavior and communicated in a professional and reasonably manner, as required by the Title VII provision, which states, "*The protection for opposition is limited, however, to those individuals who act with a reasonable good faith belief that a potential EEO violation exists and who act in a reasonable manner to oppose it.*[18]" The Plaintiff can prove in trial that she communicated reasonably and professionally during this process. For example, the Plaintiff can show via email that she asked Curry if she had violated any of Defendant BKD's policies and if Curry was indicating that the Plaintiff was being reprimanded or that the Plaintiff was at risk of being reprimanded. Curry responded to the Plaintiff by clearly stating that the Plaintiff did not violate any of Defendant BKD's policies. This is one indication that Wolfe's decision was an *adverse action*, because the Plaintiff can show, even more at trial, that Wolfe's reasoning is inadequate and untrue. Based on the circumstances, the Plaintiff can prove at trial that Wolfe's reasoning was a pretext for discrimination and an *adverse action*.

111.   Additionally, Plaintiff Westby has evidence to prove that she communicated in a professional manner with the company for the ten months that she had the offer, and, clearly, had and has adequate and even, exceptional, communication skills. Wolfe stated in his job withdrawal letter that the Plaintiff's offer was being revoked, also, because, to paraphrase and summarize, that he/they did not believe she had the communication skills

---

[18] See *EEOC Enforcement Guidance on Retaliation and Related Issues* – Notice Number 915.004 – Aug. 25, 2016 - Sections II(A)

needed to perform the Audit Associate duties based on the Plaintiff's communications about the discrimination issue, her communications with Curry, and because she did not answer the phone. Plaintiff Westby not only argues that she communicated reasonably, because she maintained professionalism, but that she gave the company ample opportunity to resolve the issue via email, which could have been easily done. Plaintiff Westby complained in a reasonable manner, and this is evidenced by her emails. The Plaintiff can show that Curry intended on retaliating and harassing her, because of comments Curry made and the actions she took. When the Plaintiff refused to answer the phone, it was not because she did not want to resolve the issue or participate in the process, but because she was trying to avoid being harassed or retaliated against. The Plaintiff believed that the agents of the company were threatening her job offer, based on their emails, comments, and actions, and believed that they, or that Curry, continued to call her in an attempt to retaliate against the Plaintiff by either intimidating her, threatening her job offer, or by attempting to engage the Plaintiff over the phone to induce her to violate some sort of policy, or to allow them to accuse her of a policy violation. Curry could have easily responded by email but refused to do so. Curry seemed to continue to escalate the issue by refusing to answer the Plaintiff's questions and by seeming to attempt to provoke the Plaintiff, but this only made the Plaintiff fear for her job more and become more concerned about the situation, which is evidence in their email communications. The Plaintiff's refusal to answer the phone should be considered as protected activity, as well, because the Plaintiff believed that Curry was attempting to violate her Title VII rights even more, by continuing to harass her. As mentioned in prior facts, the Plaintiff had asked Sollie to communicate via email rather than by phone and, also, asked Curry several times, but Curry continued to call. Overall, the Plaintiff argues that Wolfe's reasoning was not sufficient enough to support his decision to revoke Plaintiff Westby's job offer and to breach the long-term employment contract over these alleged

"communication issues", especially, because the Plaintiff has shown that her communications were reasonable and that she was well-qualified for the position. These facts also support Plaintiff Westby's claim, because they also show that Defendant BKD took an adverse action. The Plaintiff was harassed and her job offer was threatened during their investigative process. Ultimately, her job offer was revoked in the midst of the investigative and resolution process.

112.    Next, by revoking the Plaintiff's job offer two weeks before she was to start and four months after she had graduated with her master's degree; also, after she had the offer for ten months, the Defendant maliciously retaliated and ruined her accounting and auditing career, making it nearly impossible for her to find a comparable job, because she was out of school and low on resources. Defendant BKD revoked her job offer right before the hiring season and did so in a malicious manner in an attempt to prevent her from pursuing the case legally. The maliciousness surrounding the decision to revoke the Plaintiff's job offer provides even more insight into the intent of the Defendant, because this decision clearly would deter a reasonable person from pursuing legal action, and it, clearly, had a negative impact on the Plaintiff's employment, because she no longer had a job, and was put in a difficult position to obtain other, comparable employment.

113.    Overall, the Plaintiff meets the second element needed to establish a retaliation claim under Title VII, because she has shown that the Defendant BKD took an *adverse action.*

114.    The Plaintiff also asks, respectfully, that the Court deems Curry's harassing behavior to be retaliatory and a part of the *adverse action.*

115.    Because, overall, the Plaintiff can show that Wolfe's reasoning for revoking her job offer is not satisfactory, and because the revocation of the Plaintiff's, or an employee's, job offer is generally considered an adverse employment action, among these other factors noted above, the Plaintiff asks  that the Court deem Wolfe's and Defendant

BKD's actions of revoking her job offer to be *adverse actions.*

### C3. Third Element – Causal Connection

116.    Plaintiff Westby meets the conditions of the third element needed to establish a retaliation claim under Title VII, because she can show that there is a *causal connection* between the adverse action taken by Defendant BKD and the protected activity based on the timing of the adverse action, on the statements and actions made to her by agents of the company that indicated their intent to retaliate, on the falsity of Wolfe's proffered reasons, and more.

117.    In this case, the agents of the company also claimed that her (protected) communications were a reason for their decision to revoke her job offer (to take an adverse action). These are direct indications that Defendant BKD took an adverse action that was *causally connected* to the Plaintiff's protected activity. The Plaintiff's reasonings to show that she has established a *causal connection* include, but are not limited to, the statements within this section, which are described in the following paragraphs:

118.    First, there is a *causal connection* because of the *timing* between the protected activity and the adverse action. The adverse action, the job revocation, was taken four weeks after she filed her initial, internal discrimination complaint, and while they were still in the resolution process. She received the job withdrawal notice by email, sent by Wolfe, just eight hours after she received an email from Curry, who said that she would be getting back to the Plaintiff to reschedule the Skype meeting with Curry and Julie Cummings, Chief HR Officer. Her employment was terminated as a result of the discrimination investigation, which shows that there is a causal connection due to the temporal proximity, or timing.

119.    Second, there is a *causal connection*, because the Plaintiff can prove that Wolfe and Defendant BKD's reason for her job withdrawal is a pretext for discrimination

and that they had a retaliatory motive. The Plaintiff's job offer was withdrawn on September 6, 2017, because of her communications, mainly, with Curry about the discriminatory issue. This shows that there is a direct and *causal* connection between the adverse action and the Plaintiff's protected activity.

120.   Based on the above statements, but not limited to these statements, the Plaintiff has shown that there is a *causal connection* between the employer's adverse action and her protected activity through *temporal proximity* and through *other evidence*, such as the written statements in the email conversation with Curry and in Wolfe's job withdrawal letter, and in the obvious falsity of Wolfe's proffered reason, etc. As stated on the EEOC website, a *causal connection* can be established through timing and other evidence, such as by written statements and/or the openly hostile behavior of those handling the situation:

    a.    "While close temporal proximity between the EEO allegation and the manger's action can be a key factor in establishing the retaliatory motive, there have been cases in which years have passed and other evidence established that the employee's earlier EEO activities motivated the manager's action. Even absent suspicious timing, other relevant facts may include verbal or written statements; comparative evidence that a similarly situated employee was treated differently; falsity of the employer's proffered reason for the adverse action; or any other evidence from which an inference of retaliatory intent might be drawn."

    b.    And…" EEOC found that management was openly hostile towards an

employee's protected EEO activity. Specifically, the employee's manager described the employee's discrimination allegations as "unprofessional," and his higher level manager found them "highly offensive" and "bad for morale." During the subsequent EEO proceeding, coworkers revealed an overall feeling of distrust and concern about the employee after his initial complaint. EEOC noted that the first-level manager saw this growing tension, but failed to ensure that coworkers understood and respected the employee's right to file a complain"

121.    Plaintiff Westby, respectfully, moves that the Court deem that she has proven she has met the third element requirement of showing that there is a *causal connection* between the adverse action and her protected activity because she has shown that there is a temporal proximity between the adverse action and her protected activities; also, because she has explained the facts to show that she has other evidence that directly and indirectly shows there is a causal connection.

### C4. Fourth Element – A Reasonable Belief

122.    Plaintiff Westby meets the conditions of the fourth and final element to establish a prima facie retaliatory discrimination complaint, because she *reasonably believed*, for several reasons, that the alleged incidents would violate the standards of Title VII. These reasons include, but are not limited to, the following:

a.    The Plaintiff had read the "Discrimination" section on the EEOC website[19] around the time that she had sent her initial complaint on August 10, 2017,

---

[19] https://www.eeoc.gov/laws/types/race_color.cfm

about unlawful discrimination. She had read that it was illegal to discriminate against a person based on race, and that it was illegal to harass a person based on race. For example, this part of the website states,

   i.   " *Race discrimination involves treating someone (an applicant or employee) unfavorably because he/she is of a certain race or because of personal characteristics associated with race (such as hair texture, skin color, or certain facial features)*" The Plaintiff believed she had been treated unfavorably, because she had been assigned to work with someone who had something publicly posted that was discriminatory towards Asians and the Plaintiff is half-Asian. The Plaintiff did not believe that other new-hires were required to work with someone who had something publicly posted that was offensive to their race or had indicated something racist pertaining to their race, and the Plaintiff was aware that not many Asian people worked for Defendant BKD in the Asian office. The image that was posted had stereotyped the way that Asian woman looked and talked, and the Plaintiff also has some of these characteristics, such as being half-Asian, skinny, having straight black hair, etc...Because the image was discriminatory towards Asian woman and the assignment to work with Conklin could have developed into a more serious issue over the Plaintiff's six-month training requirement to work with Conklin, Plaintiff Westby *reasonably believed* that the company was violating Title VII.

   ii.   The EEOC website also states, "*The law forbids discrimination when it*

comes to any aspect of employment, including hiring, firing, pay, job

assignments, promotions, layoff, training, fringe benefits, and any other

term or condition of employment." The Plaintiff believed the assignment

to work with Conklin for training was discriminatory and could lead to a

more serious issue. She believed it would be a violation to require

someone to endure discrimination as a condition of her employment, for

training, and reasonably believed that it might have been an unspoken,

but illegal condition of her employment. This also shows that the Plaintiff

*reasonably believed* she was engaging in protected activity and

complaining about Title VII violations, or the potential for Title VII

violations to develop even more.

iii.    The EEOC site also explains, "*It is unlawful to harass a person because

of that person's race or color.*" Based on this statement, the Plaintiff

believed that the post was discriminatory and could lead to more serious

issues. Also, Sollie's and Curry's harassing and intimidating behavior, as

is described in this report several times, throughout the investigative and

resolution process was a form of harassment. The Plaintiff believed that

they were continuing to discriminate against her based on her race,

because they were harassing her. This is another reason the Plaintiff

*reasonably believed* she was complaining of Title VII violations. Also,

Conklin continued to maintain the post publicly, and the Plaintiff was still

required to work with her. Maintaining the post seemed to be

harassment, also, because Conklin knew that the post was offensive and

that Plaintiff Westby had been assigned to a new buddy to avoid any serious discriminatory issues from developing. Because she maintained the offensive post publicly, she seemed to indicate that she might have intended to harass the Plaintiff indirectly, and her intent to possibly escalate the situation upon the Plaintiff's hiring, or to continue discriminating in the workplace. For these reasons, the Plaintiff reasonably believed she was complaining of Title VII violations and/or potential violations.

iv.   The EEOC website also explains in this "Discrimination Types" section that, "*Harassment can include, for example, racial slurs, offensive or derogatory remarks about a person's race or color, or the display of racially-offensive symbols. Although the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal when it is so frequent or severe that it creates a hostile or offensive work environment or when it results in an adverse employment decision (such as the victim being fired or demoted).The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a client or customer.*" The situation was not an isolated incident. It was ongoing for several reasons. The post was not removed and the situation was not fully resolved. The situation was escalated to the headquarters office and the Plaintiff was harassed even more by Curry. After the harassment and intimidation, the Plaintiff's job

offer was revoked. The Plaintiff had *reasonably believed* that the harassment was a Title VII violation and would lead to a more serious violation of Title VII, because they threatened her job, and, then, they followed through on their threat by revoking her job offer.

v.  Furthermore, under the "Harassment[20]" section on the EEOC website, it states: "*Petty slights, annoyances, and isolated incidents (unless extremely serious) will not rise to the level of illegality. To be unlawful, the conduct must create a work environment that would be intimidating, hostile, or offensive to reasonable people. Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance.*" The Plaintiff saw here that offensive pictures could constitute harassment and could lead to a hostile work environment and that other issues could constitute harassment, such as lessening her work opportunities. The Plaintiff argues that the situation was not isolated or based on petty slights, but a multitude of factors that indicated that the company and its agents were violating Title VII by discriminating based on race in several ways, such as through the Facebook post and the assignment, by harassing and intimidating the Plaintiff, and by threatening her job offer.

b.  The Plaintiff also had found an outdated version of a discrimination policy of

---

[20] https://www.eeoc.gov/laws/types/harassment.cfm

Defendant BKD's online, which stated that it was not acceptable to post discriminatory images, drawings, or phrases, or to harass, etc., and that the company had an open-door policy that allowed employees to complain if they thought anyone violated those standards. Because she had read this policy and the policy indicated that the issues were or could be discriminatory, the Plaintiff shows that she *reasonably believed* that the issues were and/or could be Title VII violations.

c.    The Plaintiff received the updated "Anti-Harassment" policy from Curry that also reiterated the same concepts about discriminatory drawings, race-based discrimination, harassment, etc. This also shows that the Plaintiff had a *reasonable belief*.

d.    Plaintiff Westby had a *reason to believe* that the Facebook post and the act of assigning her to work with Conklin who maintained the post was discriminatory, because the Defendant, in the resolution process, had *assigned her to work with a different buddy*, indicating that they, also, believed the issue were discriminatory and that it could escalate into a more serious discriminatory issue in violation of Title VII if it were not addressed. Defendant BKD's agent's actions indicated that the issue was discriminatory, and they never stated that it was not a discriminatory issue. In Wolfe's job withdrawal letter, he implies, that the issue may not have been a discriminatory issue. But for about four weeks, the Defendant's agents took actions that made the Plaintiff believe that the issue was discriminatory and that they were taking steps to resolve the discriminatory issue, because they seemed to also

believe that it was a discriminatory issue. This also shows that the Plaintiff had a *reasonable belief.*

e.    Plaintiff Westby also *reasonably believed* that the issues were discriminatory, because she was assigned to work with someone as a condition of her training for six months who happened to have something racist publicly posted on her Facebook that singled out and was discriminatory towards Asian women; and the Plaintiff is a half-Asian (South Korean) and half-White female. Title VII prohibits discrimination based on race and demonstrates that she *reasonably believed* Title VII was being violated.

f.    Also, the post was publicly displayed, and Conklin indicated that she worked for BKD on her Facebook, had BKD friends on her Facebook, and did not indicate that her views were of her own, making her Facebook appear to be an extension of the workplace. Conklin maintained the post publicly, even after being assigned to work with an Asian person, throughout the investigative process, and throughout at least the start of the EEOC process. Conklin is pursuing a career as an accountant and likely a CPA, and should have known that it is or was inappropriate to maintain a public Facebook post that discriminates against Asian people. Also, Defendant BKD and its agents knew or should have known that by assigning the half-Asian Plaintiff to work with someone for six months with something discriminatory towards Asian women would create a discriminatory issue that could have escalated into a more serious issue. Because the agents of Defendant BKD failed to ensure that the Plaintiff would be free from workplace discrimination, they gave

Plaintiff Westby a *reason to believe* they were violating Title VII.

g.    The issue of race discrimination was ongoing and, so the Plaintiff had a *reason to believe* that the issue could escalate and that it was a discriminatory issue in violation of Title VII.

h.    More importantly, the Plaintiff was assigned to work with Conklin by an unknown agent of the company. The assignment and requirement to work with someone who had something discriminatory towards Asians publicly posted on her Facebook, while indicating, also, publicly that she was a BKD employee, is a matter of discrimination. The Plaintiff had read on the EEOC website that it was unlawful to establish discriminatory training conditions.

i.    The Plaintiff also learned once she received her job offer withdrawal letter from Wolfe that she was still required to work on the same audit team, or closely, with Conklin. Because the Plaintiff still would have been required to work closely with Conklin, even after being assigned to work with a new buddy over the discriminatory Facebook post and buddy assignment, and Conklin continued to maintain the discriminatory post publicly, the Plaintiff had a *reasonable reason to believe* that the issue was discriminatory and that it could develop into a more serious discrimination issue - because the issue appeared to not have been fully resolved and she was still required to work closely with Conklin.

j.    The Plaintiff had *reason to believe* that the issues were discriminatory, because of the way that Sollie and Curry handled the situation. Sollie did not fully resolve the issue and ignored the Plaintiff's simple request to follow-up on

the issue by indicating in more detail how the issue was resolved, which is evidenced by emails, and, instead, escalated the issue to Defendant BKD's headquarters in Springfield, Missouri. Sollie had Curry, the Employment Relations and Compliance Manager and EEO Coordinator, conduct a formal investigation without the Plaintiff's knowledge, with no differing circumstances, and without fully explaining how the issue was resolved. The Plaintiff feared that Sollie had attempted to retaliate by escalating the issue, because Sollie had been hostile in her first phone conversation with the Plaintiff and Curry was hostile in the way she handled the situation and, even, harassed the Plaintiff. This harassing behavior gave Plaintiff.Westby even more reason to believe that the issues were discriminatory. For example, they were threatening her job by suggesting that the Plaintiff was indicating that she did not want to work for BKD, and were attempting to prevent her from taking any legal actions regarding the matter by intimidating her, which is evidence by emails, and phone calls, etc.. This is a violation of Title VII, which prohibits discrimination based on race, harassment in the process, and retaliation, and for these additional reasons, Plaintiff reasonably believed she was engaging in protected activity by also complaining about the intimidation and harassment, as well as by continuing to request clarification on their resolution to the situation, or by continuing to engage in the investigative and resolution process in a professional manner.

### D.   Summary of Title VII Retaliation Claim

123.   In summary of Plaintiff Westby's Title VII retaliation claim, the Plaintiff, respectfully MOVES the Court to determine that she has established a *prima facie* case of retaliation, because she has shown that she has met the requirements of each of the elements necessary to establish a *plausible* claim, including showing that she engaged in protected activity, the employer took an adverse action, there is a causal connection, and that she reasonably believed the company was violating her Title VII rights. Plaintiff Westby, respectfully, asks the Court to proceed with the *McDonnell* burden-shifting test by prompting a response from Defendant BKD and by continuing with this legal process.

## <u>SECOND CLAIM FOR RELIEF</u>

Retaliatory Discrimination in Violation of

Colorado Anti-Discrimination Act (CADA)

C.R.S. 24-34-402 (1)(a) and (1)(e)(IV), (2016).

124.   The Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 27 through 123, above.

### A. General Legal Authorities and Standards for CADA Retaliation

125.   The Colorado Anti-Discrimination Act (CADA), C.R.S. 24-34-402 (1)(a) makes it unlawful for an employer to discriminate against an individual because of race.

126.   The Colorado Anti-Discrimination Act (CADA), C.R.S. 24-34-402 (1)(e)(IV), which also refers to Part 3 and 4 of the law, also makes it unlawful for employers to retaliate against an employee for filing a complaint of discrimination, or

because of their protected communications. This section states that it is unlawful, "…For any person, whether or not an employer…" "…To discriminate against any person because such person has *opposed* any practice made a discriminatory or an unfair employment practice by this part 4, because he has filed a charge with the commission, or because he has testified, assisted, or participated in any manner in an investigation, proceeding, or hearing conducted pursuant to parts 3 and 4 of this article."

127. CADA discrimination claims are subject to the same legal standards as Title VII claims. Agassounon v. Jeppesen Sanderson, Inc., 688 Fed. App'x 507, 509 (10th Cir. 2017); Robinson v. Reg'l Transp. Dist., No. 1:16-cv-2870-WTM-MJW, 2018 U.S. Dist. LEXIS 99098 at *23 (D. Colo. June 2018).

128. To establish a claim of retaliation under Title VII, the Plaintiff must show that she meets the requirements of the three main elements, which include that: (1) [she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action. Id. at 713- 14. (citations omitted). Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir.), cert. denied, 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002); see Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 685 (8th Cir.2001); Buettner, 216 F.3d at 713-714.

129. In addition to these requirements, the plaintiff must show that a reasonable person could believe that the alleged incidents would violate Title VII's standard. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)". Soto v. John Morrell & Co. 285 F.Supp.2d 1146, 1176 (N.D.Iowa,2003). See also, Fortner v. Ameritech Corp. 50 Fed.Appx. 187, 188-189,

2002 WL 31379880,*2 (6th Cir.Mich. 2002)("In order to establish a prima facie case of retaliation, the plaintiff must prove that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000).

### B. Introduction to Plaintiff's CADA Retaliation Claim Argument

130.   The Plaintiff claims that Defendant BKD violated this CADA statute, because she asserts that they retaliated against her maliciously for filing an informal discrimination complaint and attempting to exercise her Title VII rights.

131.   The Plaintiff can show that it is plausible that the facts of the case are true and they suggest that Defendant BKD violated this CADA provision by retaliating.

132.   Plaintiff Westby asserts and incorporates the same argument as she has asserted in her "First Claim" (paragraphs 62 to 125) for the Title VII retaliation claim, because the CADA retaliation law is based on the Title VII retaliation law. To show that she has met her burden to establish subject-matter jurisdiction and to adequately state her CADA claim, the Plaintiff, respectfully, asks the Court to refer to the Title VII retaliation claim listed in this complaint to review the elements needed to establish a *prima facie* case of retaliation under CADA, because the elements of the CADA claim and the facts of the case are identical and the same as the Plaintiff's Title VII retaliation claim (See paragraph 127 for law about CADA legal standards).

### D. Summary of CADA Retaliation Claim

133.   Less discriminatory alternatives existed to achieve Defendants' stated business purposes.

134.   As a direct, legal and proximate result of the discrimination, Plaintiff, Westby has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendant's actions, the Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. The Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

135.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on race.

136.   Plaintiff Westby is entitled to reasonable attorneys' fees and costs of suit, if applicable.

## DECLARATORY RELIEF ALLEGATIONS

137.   A present and actual controversy exists between the Plaintiff and Defendant BKD concerning their rights and respective duties. The Plaintiff contends that Defendant BKD violated their rights under Title VII, under the Colorado Law Against Discrimination (CADA). The Plaintiff is informed and believes and thereon alleges that Defendant BKD denies these allegations. Declaratory relief is therefore necessary and appropriate.

138.   Plaintiff Westby seeks a judicial declaration of the rights and duties of the

respective parties.

## INJUNCTIVE RELIEF ALLEGATIONS

139.    No plain, adequate, or complete remedy at law is available to Plaintiff Westby to redress the wrongs addressed herein.

140.    If this Court does not grant the injunctive relief sought herein, Plaintiff Westby will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for relief as follows:

1.    For a declaration that Defendant BKD's and its agents actions, policies, and practices as alleged herein are unlawful;

2.    For lost wages and all other compensation denied or lost to Plaintiff Westby by reason of Defendant BKD's and its agents unlawful actions, in an amount to be proven at trial;

3.    For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

4.    For punitive damages in an amount to be determined at trial;

5.    For liquidated damages;

6.    For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

7.    For an order enjoining Defendant BKD and its agents from engaging in the unlawful acts complained of herein;

8.    For an upward adjustment for any taxes to be paid on any damage award

amount, such as on punitive damages;

      9.     For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), Colorado Anti-Discrimination Act (CADA), and other laws, if applicable; and

      10.    For such other and further relief as this Court deems just and proper.

      11.   , The Plaintiff, will, lastly, provide a brief list to show the general extent of the damages caused, to show why she is suing for an amount greater than $75,000 in Federal Court. These include, but are not limited to the following:

      a.    In terms of *damages*, the Plaintiff has suffered in many ways, including, but not limited to:

         i.  Being unable to find a comparable job in the accounting field, or a job at all in accounting in Denver; lost wages.

        ii.  Being unable to sit for the Certified Public Accounting (CPA) exam and having the two exams that she passed drop off.

       iii.  Being unable to obtain her CPA license or work hours for licensing

       iv.  Having to completely change career paths and, likely, having to settle for a much lower paying job out of state.

       v.  Likely having to obtain a PhD in Accounting to mitigate damages, because she is unable to work in public accounting or in auditing as she had planned on doing as a student.

       vi.  Having to leave the state of Colorado to fix her accounting career

       vii.  Becoming destitute and nearly homeless

      viii.  Having a complete loss of enjoyment of life with little to no financial resources since the revocation of her job in September of 2017, or

for over a year now.

ix.   Being subjected to many other negative situations that resulted as

this situation had a domino effect on her life

x.   Extreme humiliation and embarrassment

xi.   Extreme emotional distress

Dated:  October 22, 2018                    Respectfully submitted,

Amy L. Westby

By:

AMY L. WESTBY, Plaintiff, Pro Se

PO BOX 22661, DENVER, CO 80222

## DEMAND FOR JURY TRIAL

Plaintiff Westby demands a jury trial on all causes of action and claims to which they have a right to a jury trial.

Dated:  October 22, 2018

Respectfully submitted,

Amy L. Westby

By: _____

AMY L. WESTBY, Plaintiff, Pro Se

PO BOX 22661, DENVER, CO 80222